89 U.S. 351 (____)
22 Wall. 351
WOODSON
v.
MURDOCK ET AL.
Supreme Court of United States.

*359 Mr. Britton A. Hill, for the plaintiff in error.
Messrs. W.M. Evarts, J.B. Henderson, and J. Baker, contra.
*365 Mr. Justice STRONG delivered the opinion of the court.
It has not been contended here that the complainants are not entitled to the injunction decreed by the Circuit Court, if the act of the Missouri legislature, approved March 31st, 1868, was a legitimate exercise of the legislative power. But it is insisted that the fifth section of that act is in conflict with the constitution of the State, and, therefore, that the arrangement made under it with the Pacific Railroad Company cannot be held to operate as a discharge of the company from the debt due by it to the State, or as a release of the railroad from the lien of the State's mortgage. The question presented, then, is this: Was the fifth section of the act mentioned prohibited by the constitution of the State? By the first section the governor was directed to sell the Pacific Railroad and its appurtenances, in accordance with the provisions of section five of the act, and of an act approved February 22d, 1851, entitled "An act to expedite the construction of the Pacific Railroad and the Hannibal and St. Joseph Railroad." By the second section the price for which the railroad was directed to be sold was required to be not less than $8,350,000 payable to the State treasurer, in bonds of the State or in money, within ninety days from the day of sale. If that sum was not obtained the governor was required to buy in the railroad for the State. By the third section it was made a condition of the sale that the purchaser or purchasers should bind himself or themselves to change the gauge of the road within ten years from the date of sale, so as to conform to the gauge of the Union Pacific Railroad. The fourth section enacted that upon the payment of all the purchase-money, and upon *366 the delivery of an obligation, in conformity to the requirement of the third section, the governor should execute a deed to the purchaser or purchasers conveying all such right, title, and interest in and to the said Pacific Railroad, its franchises, appurtenances, and the property belonging thereto as were subject to the lien of the State. Then followed the fifth section, which is the one mainly in contest. It enacted that if the Pacific Railroad Company should, at any time within ninety days after the 1st day of April, 1868, pay into the treasury of the State the sum of $350,000, in the bonds of the State or in money, then, and in that event, the governor should not advertise the road for sale; and if the company should, within ninety days thereafter, pay into the State treasury an additional sum equal to $5,000,000 in all (either in cash or in Missouri State bonds), the governor should, upon the production of the receipts of the State treasurer for the said amounts, execute and deliver to the said Pacific Railroad Company a deed of release for all claims, title, and interest which the State of Missouri had in and to the railroad, its property and appurtenances, and that the Pacific Railroad Company should, from and after the delivery of the deed, be fully discharged from all claims or debts due the State, and all liability growing out of the issue of the bonds of the State to aid in the construction of their railroad.
Within ninety days after the passage of this act the company paid into the State treasury $350,000, and within ninety days after such payment $4,650,000 more, in all $5,000,000, the sum specified in the fifth section, and received from the governor a deed conveying all the right, title, and interest of the State, and discharging it from all liens and claims of the State, and from all liability growing out of the issue of State bonds to aid in the construction of its road.
That this was a compromise of the claims of the State against the company; practically, a sale to the company of the State's interest growing out of its advance of State *367 bonds under the statutes of 1851, and the following years, is very plain, and such was its obvious intention. The principal of the debt was not then payable. The bonds issued by the State had not then fallen due. All of them were either twenty or thirty-year bonds, and the company was under no obligation to pay the principal until the bonds became payable. The extent of her obligation was measured by the provisions of the act of 1851. That act required the company to make provision for the payment of the principal and interest of the bonds in such manner as to exonerate the State from any advances of money for that purpose, and, had the interest been paid up to 1868, the State could then have exacted no more. The interest, it is true, was in arrears from July 1st, 1859. To that extent the State had an immediate claim upon the company, but as the whole debt, according to the agreed statement of facts, was $7,000,000, the aggregate of unpaid interest in 1868 was less than $4,000,000. The arrangement then made, by which $5,000,000 was received in full satisfaction, and the deed given, included, therefore, not only interest due, but principal which had not fallen due, and, hence, it may properly be regarded as a commutation or a sale of the rights of the State to the company.
We come then to the question whether anything in the constitution of the State prohibits such a transaction. A new constitution was adopted in 1865, the fifteenth section of the fourth article of which is as follows: "The General Assembly shall have no power, for any purpose, to release the lien held by the State upon any railroad." This provision, it is insisted by the appellants, denied to the legislature the power to make such a disposition of the interests of the State as was made in 1868 in virtue of the fifth section of the act of March 31st of that year.
The language of the prohibition is remarkable. It is not that the General Assembly shall not release the debt due to the State by any railroad company. Legislative control over the debt is left untouched. The provision has reference only to a security for the debt. Had it been intended *368 to put the debt beyond the disposition of the legislature, it would be difficult to find a reason for confining the prohibition to a release merely of the lien. But it is easy to see why it should be ordained that while the debt remained, the security for it should not be given up. And that such was the intention appears quite plainly in view of the state of things which existed when the constitution was framed and adopted. Prior to its adoption it may be said to have become almost a legislative habit to release the liens held by the State upon railroads without discharging the debts. In numerous cases statutes had been enacted by which railroad companies were authorized to borrow money, and to mortgage their roads as security for the loans, the State releasing its lien, to give the mortgagees a priority. The purposes for which these releases were made were various, and they were generally avowed in the statutes. Thus, in 1864 the legislature released the State's lien upon a part of the Pacific road, avowedly for the purpose of enabling the company to complete its main road to Kansas City. At the same time the lien of the State on the North Missouri Railroad was released for several avowed purposes,  to enable the company to complete their main road to the Iowa State line; to enable the company to construct its west branch; and to enable it to build a bridge across the Missouri River. And again, in 1865, February 16th, the legislature released the first lien of the State upon the road of the same company for the same purposes, retaining, however, a second lien. All this took place very shortly before the constitution was adopted. That such releases were contemplated when the convention framed the constitutional inhibition, and when the people ratified it, can hardly be doubted. The constitution was plainly intended to prohibit them, and, therefore, language was employed denying the power to release the lien, and saying nothing of the debt. Certainly there is no expressed restriction of legislative power over the debt itself. If any exists it must be supplied by implication. Keeping in mind, then, that the constitutional prohibition is directed only against a release of liens, what *369 should be regarded as its meaning? We agree it is not to be frittered away by doubtful construction, but like every clause in every constitution it must have a reasonable interpretation, and be held to express the intention of its framers. It must be held to have been intended for the public protection, for the preservation of the public property, and to make available claims the State held against railroads. But if it is to be construed reasonably, and in accordance with what must have been the intentions of those who adopted it, it cannot be construed literally. It cannot mean that the lien of the State upon a railroad shall not be released upon full payment of the debt, to secure which the lien was created. If it does, it is equivalent to a prohibition against the State's receiving payment. Surely it will not be contended to deprive the legislature of power to make use of the lien to enforce satisfaction of the debt, though thereby the lien be discharged. That would be to destroy the value of the lien. Nor can it mean that the lien may not be employed to obtain from the property bound by it all that the property is worth and all that the indebted company can pay, though that be less than the entire amount of the debt. It is not a restriction upon the power of the legislature to make the most which in its judgment is possible from the security. In terms the legislature is left unrestricted as to the mode of receiving payment, or settling with its debtors. Composition, accord and satisfaction, and full payment in cash are left within the legislative discretion, at least so far as the liquidation of the debt is concerned. So there is nothing in the clause of the constitution quoted which can be regarded as a restriction upon the power of the legislature to sell any claims held by the State against a railroad company. It is not an ordinance that the legislature shall not deal with debts due to the State from railroad companies as it may deal with debts due from other debtors. It is that the lien shall not be released for any purpose whatever, that is, for the accomplishment of any object the legislature might have in view, and unless we can hold this means it shall not be released even by full payment of the debt, it *370 can mean no more than this, that, while the debt remains, the legislature may not let go the security for it. Such a construction accounts for the peculiarity of the language employed. There is a very palpable distinction between the lien which the State holds upon a railroad and the debt, obligation, or duty which the lien was created to secure. The two could not have been confounded by the framers of the constitution. If it was intended that, under all circumstances, every dollar due from a railroad company should be exacted, and that no settlement should be made, or sale authorized, without payment of the uttermost farthing, it is incredible that the constitution would not have so declared. That such was not the intention is plainly shown by the railroad ordinance adopted with the constitution, and a part of the organic law of the State. By that ordinance the legislature was authorized and directed to sell the railroads on their failure to pay a tax levied, and when the sale should be made to others than the indebted companies, no limitation was directed to be affixed to the price, and such a sale, we have no doubt, would have discharged the road from the State's lien. The State itself was empowered to become a purchaser at the sale at any price at which it could buy, and whenever it purchased, the lien, of course, was merged in the title, and the General Assembly was required to provide by law in what manner the railroad, or franchises, or other property, should be sold for the payment of the indebtedness of the company in default. But the ordinance does not require that at such sale the purchaser from the State shall pay the full amount of that indebtedness. A lien is required to be reserved for all sums remaining unpaid; that is, very clearly, for all that part of the purchase money from the State at her sale which remains unpaid. If this is not the meaning, the State may never be able to sell at all, and the plain purpose of the ordinance may be entirely frustrated. And that such is its meaning has been determined by the Supreme Court of Missouri.[*] The fifth *371 section of the ordinance does, indeed, require that no railroad or other property, or franchise purchased by the State shall be restored to the company in default until it shall have first paid in money, or in Missouri State bonds, or in bonds guaranteed by the State, all interest due from said company, and requires that all interest coming due thereafter shall be paid semi-annually in advance; but even this is no assertion that such a restoration shall not be made for a sum less than the original indebtedness. Whether it may or not it is unnecessary to decide, for the provision applies only to a case where the road has been sold, and where the State has become the purchaser, which is not this case.
Neither the clause in the body of the constitution, therefore, nor any provisions of the railroad ordinance forbid the legislature to sell the railroad, or compromise the debt claimed by the State, for less than the entire indebtedness. It follows, then, that though the legislature had no power to release the lien while the debt remained, it was not prohibited from selling the claim or commuting the debt. And there is no inconsistency in this. The legislature may well have been trusted with the management of the obligation, responsible only to its constituents, while the security for the fulfilment of the obligation may have been withdrawn from its control. A trustee may have no right to give up a security for a claim, and yet be at full liberty to settle and adjust the claim itself or to sell it. It need hardly be added that if the legislature had power to accept a commutation of the claim of the State, or to sell the debt for what in its judgment it deemed best for the public interests, it had also power to make a formal relinquishment of the lien after the debt had been liquidated. The constitutional provision was not designed to continue in existence liens that the law had extinguished.
For these reasons we hold that the fifth section of the act of the legislature of March 31st, 1868, was not in conflict with that provision of the constitution which forbids, for any purpose whatever, a release of the lien held by the State upon any railroad.
*372 Nor do we perceive that there is any conflict between it and the railroad ordinance. The appellants insist that the ordinance forbids any sale of a defaulting railroad except at public auction, for a price equal to the full amount of the debt of the defaulting company, and without a reservation of a lien upon the property sold, not merely for the unpaid part of the purchase-money, but for all that remains unpaid of the debt for which the property is sold. Such is not our reading of the ordinance, nor is it that of the Supreme Court of the State. We have already said that the lien required to be reserved is only to secure the unpaid balance of the purchase-money. This is too clear for argument. It is equally clear to us the ordinance does not require that the sale shall be for a price equal to the whole debt, or that it shall be at public auction. The first, second, and third sections impose upon each of three railroad companies, of which the Pacific Railroad Company is one, an annual tax of ten per centum of the gross receipts, for two years, and fifteen per centum thereafter, until the principal and interest of the bonds for which the companies were liable should be fully paid. Then followed the fourth section, as follows: "Should either of said companies refuse or neglect to pay said tax as herein required, and the interest or principal of any of said bonds, or any part thereof remain due and unpaid, the General Assembly shall provide by law for the sale of the railroad and other property, and the franchise of the company that shall be thus in default, under the lien reserved to the State, and shall appropriate the proceeds of such sale to the payment of the amount remaining due and unpaid from said company." There is nothing in this which takes away from the legislature the power to determine the time, the manner, or the price of the sale which it was directed to cause to be made. It is true the sale is ordered to be made under the lien reserved to the State, referring, doubtless, to the mortgage taken under the act of 1851, and it is also true that by that act it was enacted that if either of the companies to which bonds might be issued should make default in the payment of either principal or interest of the said bonds, the *373 governor might sell their road by auction, giving six months' notice, or buy it in for the use of the State, but these provisions were no part of the lien. They were means specified for enforcing it. The legislature was at liberty to provide other means of collecting the debt and enforcing the lien. The sale directed by the ordinance was for non-payment of the tax imposed, and the direction to sell under the lien reserved was simply an order to proceed to collect the mortgage. The lien is not to be confounded with proceedings for its foreclosure.
Finally, it is insisted by the appellants that the fifth section of the act of 1868 is unconstitutional because its subject is not embraced in the title of the act, and because the constitution ordains that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject be not embraced in the title, such act shall be void only as to so much thereof as is not so expressed." The title of the act of 1868 is "An act for the sale of the Pacific Railroad, and to foreclose the State's lien thereon, and to amend the charter thereof." That the subject of the fifth section is embraced in this title is very apparent. If the subject is not the foreclosure of the State's lien, it is impossible to say what it is. And we think it cannot be justly said the act embraces more than one subject. It has many details, but they all relate to one general subject, which is the sale of the railroad and the foreclosure of the State's lien thereon.[*]
We cannot sustain this objection.
Nothing, then, in our judgment, warrants the conclusion that the fifth section of the act of March 31st, 1868, was not a legitimate exercise of the legislative power of the General Assembly of the State. It follows that the arrangement made in pursuance of it with the Pacific Railroad Company, and the deed of the governor to the company, extinguished the debt due to the State, and, consequently, put an end to the lien.
*374 The $5,000,000 paid to the State were raised upon bonds of the company and a mortgage, of which the complainants in the court below are trustees. The money was advanced on the faith of the legislation of 1868, and so were $3,000,000 more, for which a subsequent mortgage was given. If that legislation was not unconstitutional, as we have endeavored to show it was not, it would be a gross wrong to the bondholders who thus advanced their money, were the defendants permitted to sell the railroad, its property, and franchises, for the satisfaction of a claim or lien which has no longer any existence.
DECREE AFFIRMED.
Mr. Justice MILLER, with whom concurred Mr. Justice DAVIS, dissenting.
I cannot agree to the judgment of the court, and think the principle involved of sufficient importance to justify an expression of my views.
For many years previous to the late civil war the principal railroads in the State of Missouri had been the objects of the special care of the people, and had received large pecuniary aid from the State. This aid had been given at various times and in divers sums, in the shape of the bonds of the State, to the extent, in the aggregate, of twenty-five millions of dollars or more. For these sums, which were treated as loans, the railroad companies had consented to statutory liens in the nature of mortgages, with conditions to pay the bonds of the State, interest and principal, as they fell due. If the terms of the loan were not precisely as I have stated in all cases, they were substantially so, and any variations in special instances do not affect the question under consideration.
The State of Missouri was, almost as much as any State in the Union, the seat of the worst calamities of that war. Its people were divided among themselves; regular armies marched and countermarched over its soil, and each side used or abused the railroads to their utmost capacity when within their control. But, above all, the local guerrilla *375 warfare, to which the disputed control of her territory and the divided allegiance of her people subjected them, was the cause of immense destruction and damage of her railroads. These companies, therefore, emerged from the war with their roads in a state of repair which hardly admitted of use and the rolling stock so deteriorated that new supplies were indispensable. Their credit was low, their means exhausted, and their property apparently worth but little. They were unable to meet their obligations to the State, and were largely in arrears for the interest on the State bonds.
The State itself was in little better condition. To the heavy burdens of increased taxation, imposed by the Federal government to support the war and pay its debt, was now added the necessity of paying the interest on the large debt of the State incurred in aid of the railroad companies.
The question forced itself upon the people of the State and the railroad companies, what is to be done in this emergency? The people of the State felt the injustice, in their overburdened condition, of being called on to pay, without aid from the corporations, the debt incurred for their benefit, and this hardship was not diminished by the consideration that the roads were owned and controlled by stockholders, very few of whom were citizens of Missouri. The railroad companies felt that if their roads were to be made capable of accomplishing the purpose of their creation, all their means and all their credit must be devoted to repairing and rebuilding the roads and refurnishing the rolling stock.
The railroad companies and that part of the people of the State who felt a stronger interest in the roads appealed to the generosity of the legislature to relieve the roads from the burden of the debt to the State. Those who believed that the credit of the State and the relief of the people from the burden of excessive taxation were of paramount importance thought the State should relieve herself as far as possible by enforcing her lien at the expense of the stockholders, and by sale of the roads, realize all they would bring, and, appropriating this to the payment of the bonds of the *376 State, diminish to that extent the taxation necessary to pay the interest on her large public debt.
The appeal for leniency to the railroad companies had many and able advocates, and was warmly urged by them, and assisted by all the appliances which that class of corporations use with so much effect. The legislature had in several instances released liens altogether on some roads, and had postponed liens to let in subsequent ones, thus showing what might be expected of that body.
It was in the midst of the discussion of this question that the members of the constitutional convention of 1865 were elected, and in the face of the difficulties which it presented that the convention assembled.
They took cognizance of the matter. They understood that they were expected to adopt some plan of relief, and whatever plan was adopted must be based mainly, if not exclusively, on one or the other of the two propositions we have named. We are now called upon to give judicial construction to what they did, and, by all the rules of sound interpretation, it must be done in view of the condition of affairs which their action was intended to relieve and of the public sentiment which they intended to represent.
It was very clear then, it is equally clear now, looking alone to what was incorporated into the constitution by that convention, that it wholly rejected the idea of leniency to the railroad companies, and that its sole care was to conserve the pecuniary interest of the State.
As the constitution stood when the convention assembled it was in the power of the legislature  of any legislature  at any time, under the pressure of any influence, to release the lien of the State on the roads, or to make any other compromise of the claim of the State. If the convention was fully determined against this policy, it was their first duty to take this power from the legislative body altogether. The first thing to be done was to forbid the legislature from granting this relief. In the effort to carry out this purpose the convention placed in the body of the constitution, article IV, section 15, the declaration that "the General Assembly *377 shall have no power whatever to release the lien held by the State upon any railroad."
It seems to me strange that this provision should be the subject of a divided opinion as to its meaning. The release here meant could not have been the execution of a technical instrument called a release. No such absurdity can be imputed to the convention, because if the debt was paid, or otherwise discharged, so that the lien no longer existed, the making of such an instrument was of no value to any one. The thing prohibited was the discharge or remission in any shape of the specific lien which the State had on the roads for the repayment of the bonds she had advanced or loaned to the companies. To make this more emphatic all power whatever on this subject was taken away. No pressing exigency, no motive, however pure or generous, and no consideration even of pecuniary wisdom in which the legislature might indulge, or believe, was to justify this discharge of the lien which the State held as security for her advances. How can it be maintained in the face of this that while the legislature could not release from motives of grace, and for the purpose of a gratuity, it could release on a purpose of compromise by accepting one-third or one-half of the debt secured by the lien? If one-third could be accepted, then one-tenth. If five millions could be accepted when ten were due, then five dollars could be accepted. It is to be borne in mind that we are considering the constitutional power of the legislature to release the lien, and on this question we are not at liberty to consider whether it acted wisely or reasonably. If they could release at all, or for any consideration, the court cannot say they have exceeded their power. But the constitution seems to place all this beyond question by saying it shall not have any power whatever to do this thing.
The work of the convention was, however, to be submitted to a vote of the people. If it received a majority of the votes cast, it became the fundamental law of the land. Otherwise it passed for nothing. Other propositions were submitted separately, and might be adopted or rejected *378 without hazarding the whole instrument. But so important did the convention deem this provision that they put it into the body of the new constitution, so that the latter could not be adopted without including the former.
If, however, the question of releasing the road from its debt to the State was thus settled in the negative, there still remained the question of the present enforcement of the lien by sale or otherwise. This question was left by the convention to a vote of the people in a separate ordinance, which might be adopted or rejected without defeating the constitution itself, but which, if adopted, became part of the constitution.
Both the constitution and this ordinance were submitted at the same time, and both were adopted and became part of the fundamental law of the land at the same time. This ordinance throws a flood of light on the intention of the men who framed the constitution in adopting the section we have just discussed. It imposed a tax of ten per cent. on the gross receipts of the three principal roads from October, 1864, to October, 1868, and fifteen per cent. thereafter; to be devoted to the payment of the principal and interest of the bonds loaned by the State; and it required that if either of said companies neglected or refused to pay said tax, the General Assembly should provide by law for the sale of that road. The fifth section of this ordinance is as follows:
"Whenever the State shall become the purchaser of any railroad or other property, or the franchises sold as hereinbefore provided for, the General Assembly shall provide by law in what manner the same shall be sold for the payment of the indebtedness of the railroad company in default; but no railroad or other property or franchises purchased by the State shall be restored to any such company until it shall have first paid, in money or in Missouri State bonds, or in bonds guaranteed by this State, all interest due from said company, and all interest thereafter accruing shall be paid semi-annually in advance; and no sale or other disposition of any such railroad or other property or their franchises, *379 shall be made without reserving a lien upon all the property and franchises thus sold or disposed of, for all sums remaining unpaid; and all payments therefor shall be made in money or in the bonds or other obligations of this State."
The manner in which this ordinance was put to the people is significant. The ballot was to be, "Shall the railroads pay their bonds? Yes." "Shall the railroads pay their bonds? No." The former was a vote for adopting the ordinance; the latter was a vote against it. It is thus seen that if this ordinance was adopted, both the convention and the people were in earnest in their determination not to release any claim the State had in those companies. The peculiar provision of the above section makes this very clear. If the State became the purchaser the legislature should provide for the manner of its resale; but in no event was it to be restored by resale or otherwise to the company who had owned it until that company had first paid in money, or bonds of the State of Missouri, all the accrued interest due from said company; and all interest thereafter to accrue was to be paid in advance semi-annually. It was also provided that no sale or other disposition of such railroad should be made without reserving a lien upon all the property and franchises thus sold or disposed of for all sums remaining unpaid.
The sale or disposition here spoken of had reference to a sale to other parties than to the defaulting company. And even in that case the ordinance provided that none should be made which did not secure the State for all her liabilities on account of the road. The clause can have no other meaning but this, though it is ably argued that it means such part of the consideration of the new sale as may be on credit. But, taking the constitutional provision, the prohibition in the ordinance against a restoration of the roads without payment of what is due, and security for what is to become due, it seems to me hardly to admit of a doubt that in no event was the road to pass from the control of the State without security against any loss by reason of these bonds. But however this may be, the constitutional prohibition *380 against releasing the lien, the provisions of the ordinance for the levy of a severe tax on the gross receipts, the direction for a sale if it was not paid, and the two provisions against restoration to the same company until full payment, indicate to my mind the unmistakable determination of the convention and the people that the companies should, in the language of the prescribed ballot, "pay their bonds,"  pay them in full,  or lose their roads, their property and franchises.
The answer made to all this is, that while the legislature could not release the lien they could remit the debt. That while they could not restore the road to the same company after the State had bought it in, they could sell to the company the debt which that company owed the State at any price it chose. That while the State could not release the lien by any legislative act, it could compromise or sell the debt, and thus defeat, destroy, or part with that lien.
It is said if the convention intended to prohibit the legislature from dealing as it chose with the debt, it could easily have said so, instead of using the word lien. If the convention had said that the legislature shall have no power to discharge the debt without full payment, it could then be argued with much more force that the lien might be released though the debt could not be touched. On the other hand, so long as the lien remained the debt must remain, for there could be no lien without the debt. It seems to me, therefore, that the convention used the stronger and better term, the one which included both, and which expressed precisely what they meant, namely, that both the debt and the lien of the debt should remain inviolate except by payment. If there could be any doubt of this, the form of submission of the ordinance on which the people voted, that the "roads should pay their bonds," makes it too clear for dispute.
But of what avail are constitutional restrictions of legislative power, or legislative restrictions of municipal power, if they are disregarded by the legislatures and municipalities?
It may be said that there remains to the people the protection *381 of the courts. But language is at best a very imperfect instrument in the expression of thought, and the fundamental principles of government found in constitutions must necessarily be declared in terms very general, because they must be very comprehensive.
The ingenuity of casuists and linguists, the nice criticism of able counsel, the zeal which springs from a large pecuniary interest, and the appeal of injured parties against the bad faith of the legislatures who violate the constitution are easily invoked, and their influence persuasive with the courts, as they always must be.
And if language as plain as that we have been considering, a purpose so firmly held and clearly expressed is to be frittered away by construction, then courts themselves become but feeble barriers to legislative will and legislative corruption, and the interest of the people, which alone is to suffer, has but little to hope from the safeguards of written constitutions.
These instruments themselves, supposed to be the peculiar pride of the American people, and the great bulwark to personal and public rights, must fall rapidly into disrepute if they are found to be efficient only for the benefit of the rich and powerful, and the absolute majority on any subject will seek to enforce their views without regard to those restrictions on legislative power which are used only to their prejudice.
NOTES
[*] See 37 Missouri, 129.
[*] Cooley's Constitutional Limitations, 141 et seq.